1  Raj D. Roy, Esq. (183726)
   *roylegalgroup@gmail.com*
2  Frank P. Agello, Esq. (204471)
   *roylegalgroup@gmail.com*
3  ROY LEGAL GROUP
4  8345 Reseda Boulevard, Suite 222
   Northridge, California 91324
5  Telephone: (818) 993-3300
   Facsimile: (818) 993-4577
6
7  Attorneys for Plaintiffs
8
9              **UNITED STATES DISTRICT COURT**
10             **CENTRAL DISTRICT OF CALIFORNA**
11                    **EASTERN DIVISION**

| | |
|---|---|
| KALAJ, INC., a California Corporation; and N&C TRUCKING, INC., a California Corporation; <br><br> Plaintiffs, <br><br> vs. <br><br> FEDEX GROUND PACKAGE SYSTEM, INC., a Delaware Corporation; and DOES 1 to 100, Inclusive, <br><br> Defendants. | **CASE NO.: 5:17-cv-02060-JLS-KK** <br><br> SECOND AMENDED COMPLAINT FOR DAMAGES: <br><br> 1. BREACH OF CONTRACT <br> 2. BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING <br> 3. INTENTIONAL INTERFERENCE WITH A PROSPECTIVE ECONOMIC ADVANTAGE; <br> 4. NEGLIGENT INTERFERENCE WITH A PROSPECTIVE ECONOMIC ADVANTAGE; <br> 5. NEGLIGENT HIRING, RETENTION AND SUPERVISION |

ROY LEGAL GROUP
———*&*———
Attorneys at Law

SECOND AMENDED COMPLAINT FOR DAMAGES

## OVERVIEW OF COMPLAINT

Plaintiffs, Linehaul Ground Contractors for Defendant FEDEX, employing dozens of drivers and trucks to haul packages, allege their contracts were wrongfully and by pretext terminated in retaliation for seeking increased compensation and complaining about conditions at the Rialto terminal in Bloomington, California, and because of the unwarranted enmity of yard manager, Martin Daza.

Plaintiffs further contend that Defendant FedEx breached the Linehaul contract by forcing them to engage in the company's willful and systemic violations of DOT safety rules in order to get packages delivered on time. After aiding and abetting the violations, Defendant FedEx now, incredibly, is attempting to use the Plaintiffs' breach of DOT rules as a basis for their termination, despite their own objectively unreasonable conduct.

Finally, upon termination of the Linehaul Agreement, Defendant FedEx unconscionably forced Plaintiffs to give up their contractual rights to sue for wrongful termination by forcing them to sign a General Release giving up those rights. Defendant FedEx did this by threatening to breach the contract by not giving their reasonable consent to the assignment of Plaintiffs' independently owned sales routes, (which are worth millions of dollars), after the contract was terminated. That right to reasonable consent to assignment, however, is an

SECOND AMENDED COMPLAINT FOR DAMAGES

"accrued right," of Plaintiffs and obligation of Defendant, which would have survived the termination of the contract.

Defendant's tortious conduct related to the termination of contract caused Plaintiffs substantial financial damages in lost future income and because they were forced to sell their lines in short period of time and for less than full value.

## STATEMENT OF JURISDICTION

1. The District Court has subject matter jurisdiction since: (1) complete diversity exists, and (2) the amount in controversy, exclusive of interest and costs, exceeds the jurisdictional minimum of $75,000. 28 U.C. Section 1332(a); See also, *Singer v. State Farm Mut. Auto Insurance Co*., 116 F.3d 373, 376 (9th Cir. 1997).

2. Complete diversity of Citizenship exists because at the time of filing of the action, and at all time herein, Plaintiffs are citizens of California, while Defendant FEDEX Ground is and at the time of the filing of this action was, a citizen of both Delaware, its place of incorporation, and Pennsylvania, its principal place of business.

3. The amount in controversy exceeds the Jurisdictional Minimum of $75,000.

## PARTIES

4. Plaintiff KALAJ, INC. ("Plaintiff KALAJ, INC.") is a Corporation incorporated and duly authorized to do business in the State of California, with

principal executive office and business office located at 31684 Paseo Goleta, Temecula, CA 92592.

5. Plaintiff N&C TRUCKING, INC. ("Plaintiff NCT") is a Corporation incorporated and duly authorized to do business in the State of California, with a Principal Place of Business, principal executive office and business office located at 31684 Paseo Goleta, Temecula, CA 92592.   Plaintiffs KALAJ, INC. and NCT are hereinafter collectively referred to as "Plaintiffs".

6. Defendant FEDEX GROUND PACKAGE SYSTEM, INC. ("Defendant FedEx") is a Foreign Corporation, organized in Delaware and duly authorized to conduct business and conducting business in the State of California, with principal place of business and executive office at 1000 FEDEX Drive, Moon Township, Pennsylvania, 15108, and principal business office in California at 818 West Seventh Street, Suite 930, Los Angeles, CA 90017.

7. Plaintiffs are informed and believe, and thereon allege, that the Defendants named herein as DOES, 1 to 100, inclusive, are in some way responsible for Plaintiffs' damages as stated herein.  Plaintiffs are currently unaware of the names and capacities of these DOE Defendants, but will amend this complaint to assert the true names and capacities of the DOE Defendants when the same has been ascertained.

8. Plaintiffs are informed and believe, and thereon allege, that at all times herein mentioned, the DOE Defendants now and were the agents, servants, employees, representatives and/or alter egos of each of the remaining Defendants and, in doing the things hereinafter mentioned, were acting in the course and scope of their authority as such agent, servant, employee and/or representative with the permission and consent of the remaining Defendants.

## FACTUAL BACKGROUND

9. In 1994, Plaintiffs' owner, Nick Kalaj, (hereinafter, "Mr. Kalaj"), began his relationship with Defendant FEDEX when he worked at the company as a truck driver.  After a few years, Mr. Kalaj invested his life savings into becoming a linehaul contractor of Defendant FEDEX. On March 4, 1996, Mr. Kalaj executed a Linehaul Contractor Operating Agreement with Defendant FedEx (then "Roadway Package System, Inc."). Attached as Exhibit 1, is a true and correct copy of the Operating Agreement, (hereinafter, "Agreement").

10. Having obtained success in this venture, and encouraged by defendant managers to expand and promised by them that they would give him "as much business as he could handle," Mr. Kalaj began purchasing more trucks and began hiring his own drivers in anticipation of having a long and successful relationship with them.

ROY LEGAL GROUP
————&————
Attorneys at Law

11. Mr. Kalaj incorporated Plaintiff NCT in 2006, and began transporting packages for defendant with these new trucks and drivers. On information and belief, NCT was assigned the previous linehaul contract with FedEx executed by its owner, Mr. Kalaj.

12. In 2014, Mr. Kalaj further expanded his ground transportation business by incorporating Plaintiff KALAJ, INC., which executed a Linehaul Contractor Operating Agreement with Defendant.   This Operating Agreement-KALAJ, INC was amended to include addendums on August 21, 2015. Attached as Exhibit 2, is a true and correct copy of the amendment/addendums.

13. Said Operating Agreements compensated Plaintiffs for transporting FEDEX packages across the 48 contiguous United States.  Typically, this was accomplished by his team picking up pre-loaded trailers at  defendant FedEx's Rialto terminal. Further packages were transported by Plaintiffs when they received other pre-loaded trailers at their destination locations, which in turn they returned to Rialto. Each of Plaintiffs' big rigs prominently displayed the FEDEX logo and the trucks could only be used in service of Defendant.

14. The Operating Agreement further compensated contractors with additional revenue during "peak season," which ran from October through December, each year.  This additional revenue paid contractors extra money per mile as an incentive to deliver more packages during the holiday season.  Peak

ROY LEGAL GROUP

———————

Attorneys at Law

season money was an important factor in determining the amount of annual profits for Plaintiffs.

15. Importantly, the Linehaul contracts renewed automatically at the end of each contract period, unless the one party gave written notice of its termination 30 days prior to its expiration.  Each of the contracts entered into by Mr. Kalaj personally and with his Plaintiff corporations renewed automatically such that Mr. Kalaj had been in a contractual relationship with defendant to haul packages for more than 20 years under the original contracts, save for the 2015 addendums.  Indeed, given the assurances by defendant managers that work would always be readily available, Mr. Kalaj greatly expanded his operations at considerable expense in anticipation of a further and longer lasting relationship with defendant FedEx.

16. FedEx contractors, like Plaintiffs, purchased specific dedicated routes to transport packages that are exclusive to them. These routes can be both assigned and unassigned.  These dedicated lines are valuable to the contractors and are regularly bought and sold by contractors amongst themselves or others with FedEx approval, which, by contract, could not be reasonably denied.

17. Once assigned, Defendant FedEx agreed not to interfere with the Contractors operations within their purchased sales routes.  In a FedEx brochure describing Linehaul opportunities, FedEx stated:

SECOND AMENDED COMPLAINT FOR DAMAGES

ROY LEGAL GROUP

————ɬy————

Attorneys at Law

FedEx Ground contracts with independent businesses that utilize their own employees to provide package pickup, delivery and/or transportation services to customers within an *agreed upon service area*. These independent businesses, or contracted service providers, retain authority to determine the best means to meet customer expectations and demands, including complete discretion over and responsibility for delivery work area configuration, route design, delivery sequence, type and number of equipment, and staffing and personnel decisions.

Attached as Exhibit 3, is a true and correct copy of said brochure.

18. Regarding the sale of the routes, by contract, FedEx agrees that consent to the assignment of the sales routes will not be unreasonably withheld and that a decision regarding the proposed transfer shall be made by them within 30-days of notice of the assignment. Addendum 16 of the Linehaul agreement states:

**6. Assignment of the Agreement and Transfer of Rights, Obligations and Duties.**

Contractor may assign this Agreement or otherwise transfer all of its rights or obligations under the Agreement with the prior written consent of the FedEx Ground, *which consent shall not be unreasonably withheld*, provided that, the Parties acknowledge and agree that, in all instances, the withholding of such consent by FedEx Ground shall not be deemed unreasonable if in the reasonable discretion of FedEx Ground (A) the assignment or transfer proposed by the Contractor would result in the inability of a contractor to achieve the results contracted for in the Agreement …..

In connection with any such proposed assignment or transfer, the Contractor proposing the assignment shall provide advance notice to FedEx Ground in writing …. FedEx Ground, as soon as practicable, but *no more than 30 days* after receipt of such written notice, will notify the contractor in writing of its consent or lack thereof to any such assignment or transfer. *See,* Exhibit 2, pages 2.75 and 2.76.

SECOND AMENDED COMPLAINT FOR DAMAGES

19.  The above contractual language, although dealing with the assignment of the Agreement, by contract, also includes the sales routes held under the Agreement.  Addendum 20 to the Linehaul Agreement states:

**9.2 Contractor Assigns This Agreement.**
If, pursuant to the applicable provisions of this Agreement, Contractor assigns this Agreement to another entity, FedEx Ground agrees that any AR, (Assigned Run), and/or URP, (Unassigned Run Position), held under the Agreement, together with any points credited to the associated tractor IDs, will be transferred and made part of the assignee's agreement ….
*See,* Exhibit 2, pg. 2.94

20. As further proof of Defendant FedEx's obligation to provide reasonable consent to assignment, in their reference document entitled "Asset Transfer," form CRL-700, Defendant concedes that they "may not unreasonably withhold consent:"

**Notice of Proposed Assignment or Transfer, CR-030**
**Note:** FedEx Ground may not unreasonably withhold consent to a proposed transfer or assignment.  Consent shall be granted unless there is a legitimate belief that an acquiring IC will be unable to achieve the results set for in the particular agreement.  *See,* Exhibit 4, pg. 4.6.

Attached as Exhibit 4, is a true and correct copy of CRL-700.  *See,* pg. 4.7; *See also,* Exhibit 4, pg. 4.3.

21. The sale of FedEx routes typically was accomplished through the use of business brokers who advertised the lines nationally and sold them on a secondary

marketplace.  Attached as Exhibit 5, is a true and correct of a Business website[1] , which describes what sales routes are and lists business brokers of those lines.

22. As to the Agreement, each time Plaintiffs did not negotiate any of the terms to them. The form Operating Agreements were provided to Plaintiffs' owner, Mr. Kalaj, an Albanian immigrant with no college education, by Defendant FedEx. The form Operating Agreements were prepared by Defendant FedEx attorneys, employees, and/or agents.

23. Prior to the wrongful termination of the Operating Agreements, Plaintiff KALAJ, INC. had six (6) big rig trucks to service its routes while Plaintiff NCT had seventeen (17) trucks. The monthly finance payment on Plaintiffs' trucks exceeded $46,000 per month.  Plaintiffs regularly employed fifty-two (52) drivers in their combined fleet.

24. By 2015, the combined revenue of the two Plaintiff corporations exceeded $6,000,000, and with a 20% profit margin, their net revenue was $1,200,000, annually.  Additionally, the companies owned 6 dedicated sales routes and 5 unassigned sales routes.  If sold today, the fair market value of those lines would have been $3,400,000.

25. The Operating Agreements has several sections vital to Plaintiffs' claims. Section 1.14, number 15 states that when the Contractor's offense is

---

[1] https://fitsmallbusiness.com/fedex-routes-for-sale/

SECOND AMENDED COMPLAINT FOR DAMAGES

ROY LEGAL GROUP
————————
Attorneys at Law

"Falsifying any safety-related report or document," if the Contractor has two or more trucks and one or more drivers: "First offense, driver disqualified; Second offense in 12 months, driver disqualified, indemnity terminated; Third offense in 12 months, contract termination."

26. Section 1.14, number 18 states that when the Contractor's offense is "Failure to maintain hours of service records in accordance with DOT regulations in any 12 consecutive months," if the Contractor has three or more trucks and one or more drivers: "Fourth offense, indemnity terminated; Fifth offense in 12 months, contract termination."

27. Section 9.1 of the Operating Agreements allowed the parties to terminate their relationship by mutual agreement.  The provision allows unilateral termination by Defendant FedEx only "if the other party breaches or fails to perform the contractual obligations imposed by [the Operating Agreements]".

28. Furthermore, Section 7 of Addendum 16 of the Operating Agreement states that "[i]f within seven days of receiving notice of an opportunity to cure the breaching Party demonstrably remedies any breach and/or takes steps to ensure that similar breaches will not occur in the future, termination of the Operating Agreement will not be warranted."

29. Also, Section 9.3 of the Operating Agreements provides for arbitration "[i]n the event [Defendant FedEx] acts to terminate [the] Agreement … and

ROY LEGAL GROUP
———§———
Attorneys at Law

Contractor disagrees with such termination or asserts that the actions of RPS are not authorized under the terms of [the] Agreement."  This is an important right for Plaintiff because it allows them to sue Defendant for wrongful termination of Agreement.  The right to sue for wrongful contract termination is so important that the Courts have overturned this provision in the Agreement, in favor of Pennsylvania's four-year statute of limitations in bringing such an action. See *Openshaw v. FEDEX Ground Package Sys., Inc.,* 731 F. Supp. 2d 987 (C.D. Cal. 2010).

 30. Plaintiffs covered eleven geographically expansive routes. Plaintiffs and their drivers enjoyed excellent relationships with their customers, and Defendant FEDEX even commended Plaintiffs for the quality of their services.

 31. However, in March, 2015, a new yard manager, Martin Daza, was assigned to the Rialto hub by defendant FedEx which gives rise this suit.

 32. In 2006, Mr. Daza was hired by defendant FedEx as a "Regional Manager Home Delivery," in Placentia, CA, whereby he was responsible for managing twenty-two, (22), facilities in five western states, which provided residential delivery services.  Attached herein as Exhibit 6, is a true and correct copy of Mr. Daza's resume taken from his website, www.martindaza.com, in September, 2017.

SECOND AMENDED COMPLAINT FOR DAMAGES

33. On information and belief, Mr. Daza proved his unfitness as a manager of any kind by being named as a party in a lawsuit brought by another FedEx employee which alleged tortious work related conduct.

34. Rather than fire Mr. Daza, despite his unfitness to manage, defendant FedEx demoted Mr. Daza such that he became a "Senior Manager," of a single facility, the Rialto terminal, Plaintiffs' home base in March, 2015.  Immediately, Mr. Daza let it be known that he "hated contractors," and began systematically to harass and disrupt their businesses.

35. Specifically, initially, Mr. Daza displayed his enmity toward contractors by reversing the previous "open door policy," whereby contractors could communicate with the senior yard manager to find out what was expected of them and they, in turn, could express their operational concerns to him.  Mr. Daza further began to restrict the Rialto yard access to contractors, including Plaintiffs, which affected Plaintiffs ability to generate revenue because of the substantial wait times contractor trucks and drivers needed to wait off-site before being offered a pre-loaded trailer to haul.  Contractors were not offered additional compensation for the wages paid to their drivers during these lengthy wait times.

36. Instead, Mr. Daza began to favor "outside carriers," (those big rig carriers without contracts), by giving them preferential loads without a substantial wait time.  These outside carriers were typically employed during the holidays,

ROY LEGAL GROUP

Attorneys at Law

when contracted teams were busy and could not handle all of defendant's deliveries.  However, upon Mr. Daza's assignment to the Rialto terminal, the outside carrier presence there increased dramatically.

37. On April 23, 2015, Mr. Kalaj on behalf of the Plaintiff companies, along with more than 20 other contractors with operations in Rialto, raised these Daza and contract-related issues with Defendant FedEx by email.  They stated that their mileage compensations were below standard, that there was no compensation for retention/waiting times for loads, (which usually averaged 2 to 6 hours daily for every driver), and that outside carriers were given an unfair advantage over contractors (*e.g.*, shorter wait times, payment of compensation for wait times, most desirable dedicated routes), among others. Attached herein as Exhibit 7, is a true and correct copy of said email.  Their specific complaint about Mr. Daza, as described above, can be found in paragraph 11 of the email.

38. Thereafter, Defendant FedEx, through Mr. Daza and others, began to embark on systematic audits and termination of the contracts of the involved contactors, including Plaintiffs, in retaliation for their concerns expressed in the April 23, 2015, email.

39. The signatory contractors to the April, 2015, email, were being singled out for the harassing behavior by Mr. Daza, including Mr. Kalaj. His companies

SECOND AMENDED COMPLAINT FOR DAMAGES

ROY LEGAL GROUP

————————

Attorneys at Law

were selected for audits, despite exhibiting exemplary work practices over the 22 previous years with defendant FedEx.

40. Additionally and by pretext, Mr. Daza wrongfully attributed an accident caused by one of Mr. Kalaj's drivers, Allan Burnini, to Plaintiffs, even though the driver was on loan to another contractor, Ramtrans, Inc., and not working for Plaintiffs when an accident occurred in June, 2016. Plaintiffs allege that because Mr. Kalaj relinquished control of his driver while in the employ of another, a special relationship existed between the driver and his temporary employer such that the subsequent employer is fully responsible for his torts, pursuant to *Marsh v. Tilley Steel Co.,* (1980) 26 Cal.App.3d 486, 492. Despite this, Mr. Daza attributed blame for the accident to Mr. Kalaj and Plaintiffs.

41. Further, on June 23, 2016, Defendant FedEx abruptly suspended their contracts, without any concluded inquiry or investigation, that Plaintiffs dispatched single drivers on team runs and allowed (or failed to correct) the inputting of incorrect information into the Electronic Logging Devices (ELDs). Defendant FedEx excluded Plaintiffs from dispatch/tender of runs and declared them ineligible to provide driving services to the company thus preventing the Plaintiffs to operate at the normal, anticipated profit levels, crippling their ability to retain their drivers and pay the monthly finance charges for their trucks.

SECOND AMENDED COMPLAINT FOR DAMAGES

42.  Having one driver on a two-man run and falsifying driver log books in violation of Department of Transportation Safety Rules was custom and practice forced upon Contractors by FedEx, who willfully forced Contractors to violate these rules in order to deliver packages on time. If a Contractor would not  agree to do a one-man run when two were required, Defendant FedEx employees at the Rialto yard would deduct a point in their point reward system, which would lead to poor performance evaluations and an eventual termination of the contract.

43.  Similarly, Defendant FedEx employees would force Contractor drivers to falsify driver logs, even providing them with "liquid paper" to make corrections and showing them how to make the false entries.

44.  Defendant FedEx therefore breached the Linehaul Agreement by aiding and abetting the violation of DOT safety rules. Section 1.1, (h), of the Agreement requires that the Contractor "conform to all applicable Federal, State and local laws, regulations and ordinances."   However, this provision applies mutually to both the Plaintiff and Defendant herein.

45.  Incredibly, despite their own objectively unreasonable behavior, Defendant FedEx is attempting to use Plaintiffs' violations of DOT rules as a basis for their termination, even though the violations were a condition of continued employment.  Plaintiffs, who were powerless to stop the violations, contend the

ROY LEGAL GROUP
————§————
Attorneys at Law

SECOND AMENDED COMPLAINT FOR DAMAGES

violations occurred on about 2% of their runs delivered for Defendant FedEx over the life of the Agreement.

46. On June 24, 2016, Defendants sent Plaintiffs a "Notice of Opportunity to Cure," which described the violation regarding the single driver on a team run. Attached as Exhibit 8, is a true and correct copy of said Notice.

47. Upon receipt of the Notice, Mr. Kalaj attempted to contact other FedEx managers to determine why Mr. Daza had shut him down, given he was doing everything Defendant FedEx wanted directed his companies to do.  On June 26, 2016, Mr. Kalaj sent an email to Jim Kappa, Managing Director of Contractor Relations, detailing what happened to his companies.  Attached as Exhibit 9, is a true and correct copy of said email.

48. In the email, Mr. Kalaj details his attempts at getting Mr. Daza to reconsider such a harsh shut down and describes how he has already lost more than $25,000 in revenue with just a few days of lost runs.

49. Mr. Kalaj promptly responded to Defendant FedEx' Opportunity to Cure, on June 27, 2016, by email.  Attached as Exhibit 10, is a true and correct copy of said response.  In the email, Plaintiffs furnished written assurances to Defendant FedEx on the following matters: (1) full cooperation in the investigation by providing data and documents; (2) personnel training on ELD Hours of Service compliance; (3) enforcement of measures to ensure that at least two qualified

ROY LEGAL GROUP

Attorneys at Law

drivers are dispatched for team runs and providing a compliance plan; and (4) guarantee that no personnel who falsified Hours of Service or other records are assigned to provide services.

50. Despite the written assurances, Defendant FedEx through Mr. Daza, refused to lift Plaintiffs' suspension. Defendant FedEx continued excluding Plaintiffs from dispatch, citing performance issues and the Alan Burnini accident as a basis for suspension.

51. Eventually, as Defendant FedEx continually excluded Plaintiffs from dispatch and threatened immediate termination it was clear that they were going to terminate the Agreement.

52.  Beginning in July, 2016, Martin Daza and others began to state orally and in writing that they were going terminate Plaintiffs' Agreement for material breach and therefore withhold their obligation to provide reasonable consent to the assignment of Plaintiffs' sales routes, which would cost Plaintiffs millions of dollars if they could not sell the lines.  Attached as Exhibit 11, are Contract Termination Notices, dated August 4, 2016, and August 19, 2016, stating Defendant's desire to terminate the Agreement.

53.  Importantly, FedEx wrongfully assumed that if the Agreement was terminated, they would  not have to provide consent to the Assignment of Plaintiffs

SECOND AMENDED COMPLAINT FOR DAMAGES

ROY LEGAL GROUP
————
Attorneys at Law

sales routes, even though they are contractually obligated to do so, as described above.

54.  Rather, and in hindsight, Plaintiffs contend that their "accrued rights" in the Agreement would have obligated Defendant FedEx to provide their reasonable consent to assignment, even after termination of the Agreement.  "Accrued Rights," in a terminated contract include the right to sue for wrongful termination of the contract and for specific performance.  Here, the specific performance demanded by Plaintiff would be to enforce Defendant's obligation to reasonably approve the assignment of their valuable sales routes.

55. Instead, Defendant FedEx cajoled, intimidated and fraudulently  stated to Mr. Kalaj and his attorney Byron Husted, that the Agreement allowed them to terminate and withhold consent because they weren't obligated to further perform on a terminated contract.

56.  These misleading and false allegations about their ability to withhold reasonable consent, was a draconian scheme by Defendant to get Plaintiffs to give up their rights to sue for wrongful termination of the Agreement.  Defendants agreed to "forbear" the termination of the Agreement if Mr. Kalaj signed a General Release giving up his rights to sue for wrongful termination. Attached as Exhibit 12, is a series of emails between the parties attorneys regarding the forbearance of termination issues in order to allow Plaintiffs time to sell their lines.

SECOND AMENDED COMPLAINT FOR DAMAGES

57.  In short, Defendant FedEx unethically threatened to breach the Agreement by not giving reasonable consent to the sale of Plaintiffs' routes unless Plaintiffs signed a General Release to give up their rights to sue for wrongful termination.  This scheme forces a "Hobson's Choice," upon Contractors – sign the General Release to get something, rather than nothing, even though they were wrongfully terminated.  This unprecedented control over Contractor sales routes and the ability to deprive Contractors of their wrongful termination rights is not based on any language found in the Agreement or its addendums.

58.  Defendant further put a short time period of several weeks for Plaintiff to sell the lines, which cost Plaintiffs to incur substantial financial damages because Plaintiffs were unable to get full market value of the routes due to the short time period.

59.  On August 31, 2016, Mr. Kalaj, on behalf of Plaintiffs, signed a General Release related to the termination.  As evidence of their scheme to get Plaintiffs to give up wrongful termination rights by threats of withholding consent, the Release states:

> **D.** FedEx Ground, NCI and Kalaj agreed that, in exchange for NCI and Kalaj executing this release and satisfying other conditions, FedEx Ground will forbear from immediately terminating the Operating Agreement *and from withholding consent* to NCI's proposed Assignment of its Operating Agreement upon satisfaction of certain conditions. *See,* Exhibit 13, page 13.1.

ROY LEGAL GROUP

— — —§— — — —

Attorneys at Law

SECOND AMENDED COMPLAINT FOR DAMAGES

Attached as Exhibit 13, is a true and correct copy of said General Release.

60. As an example of the economic damage caused to Plaintiffs by the time limitations imposed by Defendants, Plaintiffs obtained an offer to purchase its lines from another contractor, Rodriguez Carrier, for an amount in excess of $2,600,000, in August, 2016.  However, Plaintiffs were not permitted to do so because defendant FEDEX, through Mr. Daza and others, wrongfully and unreasonably refused to allow the purchase when the deal was presented to them for their permission and approval.

61. Plaintiffs were forced to sell their lines at grossly low prices.  The amount of sale was $1,200,000, to Julia, Inc.

62. Incredibly, these wrongful acts were not confined to Plaintiffs and Mr. Kalaj.  Mr. Kalaj had relatives that were also contracted FedEx linehaulers at the Rialto yard, including cousin, David Kalaj, and nephew, Joseph Mazi.  These gentlemen were also signatories to the April 23, 2015, complaint email to defendant FedEx regarding conditions at the Rialto terminal and the conduct of Mr. Daza.

63. As to David Kalaj, Martin Daza employed the same scheme of wrongfully terminating his Linehaul Agreement and then threatening to withhold consent if David did not sign a General Release giving up his rights to a wrongful termination lawsuit.  They further forced David to sign a General Release that was

ROY LEGAL GROUP

————*§*————

Attorneys at Law

in the same in content as that of Plaintiffs. Emboldened by their scheme, Martin

Daza proclaimed in a November 9, 2016, letter to David Kalaj:

> On October 21, FedEx Ground communicated that <u>it is amenable to forbear from exercising its contractual rights to, not to consent to assignment, to terminate the Agreement upon its expiration</u>, or earlier for cause, so as to provide and opportunity for DLEE, (David Kalaj's company), to assign in accordance with the Agreement and subject to stated conditions … *See,* Exhibit 14.

Attached as Exhibit 14, is a true and correct copy of said November 9, 2016,

letter and an executed November 14, 2016, General Release.

64. As to Nick Kalaj's nephew, Joseph Mazi, the scheme of wrongfully

terminating Contractors who signed the April 23, 2015, email, and then forcing

them to give up wrongful termination rights by threatening a breach of contract by

a withholding of reasonable consent, continued.  On December 2, 2016, Martin

Daza sent Mr. Mazi a letter detailing his threat of immediate termination and the

withholding of consent, unless Mr. Mazi signs a General Release, giving up

important future rights. Attached as Exhibit 15, is a true and correct copy of the

December 2, 2016, letter.  The letter also exemplifies the false time limitations

imposed by Defendant.  In the December 2, 2016, Mr. Daza gives Mr. Mazi until

January 11, 2017, to agree to the scheme, a period of about 5 weeks.

65. The wrongful and unjustified terminations of Plaintiffs' contracts were

the result of the unwarranted enmity against contractors by Senior Yard Manager,

SECOND AMENDED COMPLAINT FOR DAMAGES

ROY LEGAL GROUP

————§————

Attorneys at Law

Martin Daza, who had the intent to disrupt and destroy their long lasting business relationship and harm them economically.  Defendant FEDEX knew, or by reasonable diligence should have known, that the Mr. Daza's tortious conduct would cause harm to Plaintiffs.

66. Alternatively, Mr. Daza was working in the course and scope of his employment with Defendant in doing these wrongful acts to Plaintiffs, who directed or ratified the tortious conduct.

67. On information and belief, Mr. Daza was fired by defendant FedEx due to his acts as described herein, in December, 2016.

## FIRST CAUSE OF ACTION: BREACH OF CONTRACT

68. Plaintiffs re-allege and incorporate by reference the above paragraphs as if fully set forth herein.

69. Each of the Plaintiffs have performed all the acts required of them under their Operating Agreements.

70. Defendant breached the Operating Agreement by forcing Plaintiffs to violate DOT safety rules; which are a violation of the mutually applicable "Standards of Service" portion of the Agreement, ¶1.1 (h).

71. Defendant also breached Section 1.14 numbers 15 and 18, which covered its supposed grounds for the termination of Plaintiffs' agreements, since they did not inform Plaintiffs of their first or succeeding offenses nor give Plaintiffs any

warning or memorandums before they decided to suspend Plaintiffs' operations and terminate their contract. In fact, Plaintiffs were never charged with any first or previous offenses nor was there any preliminary determination of Plaintiffs' guilt for any first or previous offenses prior to their termination of Plaintiffs' Agreement.

72. Furthermore, Defendant breached Section 7, of Addendum 16, of the Operating Agreement when it threatened termination of Plaintiffs' Agreements despite their response to it within seven days. Plaintiffs' response explained in detail their remedies for any supposed breach and the steps they took to ensure similar breaches would not occur in the future.

73. Defendants further breached the operative contracts by unreasonably imposing time limitations for Plaintiffs to sell their lines, which caused Plaintiffs to sell their lines at less than full value. Defendant further denied Plaintiffs the right to sell their lines in August, 2016, to Rodriguez Carrier, in a sale amount of $2,600,000. Defendants breach caused financial injury to Plaintiffs in that they ultimately sold the lines for $1,200,000 to Julia, Inc.

74. Finally, Defendant breached the Agreement by failing to provide reasonable consent to the assignment of Plaintiffs' sales routes without time limitations and the need to sign a General Release, which caused Plaintiffs to give

SECOND AMENDED COMPLAINT FOR DAMAGES

ROY LEGAL GROUP
————————
Attorneys at Law

up other important rights within the Agreement, such as the ability to sue for wrongful termination of the Agreement.

75.  Defendants' breach of the Linehaul Operating Agreements has caused Plaintiffs to be permanently harmed in that their ongoing operations have been terminated.  Said operations were generating approximately $6,000,000 in revenue with an average annual profit of 20% of revenue at the time of the breach. Defendants' breach has caused Plaintiffs to lose future revenue in an amount to be proven at trial.

76. The Defendant's conduct herein was a substantial factor in causing harm to Plaintiffs.

WHEREFORE, Plaintiffs pray for relief as hereinafter provided.

## SECOND CAUSE OF ACTION:
## BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

77. Plaintiffs re-allege and incorporate by reference the above Factual Allegations as if fully set forth herein.

78. Plaintiffs NCT and KALAJ, INC., entered into Linehaul operating agreements with Defendant FEDEX in 2006 and 2014.  In performance of these contracts, Plaintiffs did all, or substantially all of the significant things that the contract required.

SECOND AMENDED COMPLAINT FOR DAMAGES

ROY LEGAL GROUP

————————

Attorneys at Law

79. The Defendant unfairly interfered with Plaintiffs' right to receive benefits under the contracts in the manner described herein. Defendant deprived Plaintiffs of the benefits of the Agreement by, among other things, forcing Plaintiffs to violate DOT safety laws and unreasonably denying and/or imposing limitations on, a assignment of their sales routes .

80. Plaintiffs were harmed by Defendant's "objectively unreasonable conduct," regardless of their motive, in an amount to be proven at trial, but not less than $1,000,000, which represents the natural and direct consequences of the Defendant's breach.

WHEREFORE, Plaintiffs pray for relief as hereinafter provided.

## THIRD CAUSE OF ACTION:
## INTENTIONAL INTERFERENCE WITH A PROSPECTIVE ECONOMIC ADVANTAGE

81. Plaintiffs re-allege and incorporate by reference the above Factual Allegations as if fully set forth herein.

82. Plaintiffs and third-party, Rodriguez Carrier, Inc., were in an economic relationship that probably would have resulted in an economic benefit to Plaintiffs when they offered to purchase Plaintiffs' lines for $2,600,000 in August, 2016.

83. Defendant FedEx knew of the economic relationship because any sale of lines had to be approved by them, and the deal was presented to them for approval.

ROY LEGAL GROUP

————§————

Attorneys at Law

84. Further, Defendant's imposed time limitations upon which Plaintiffs could sell their valuable sales routes, which caused them to be sold at less than fair market value.

85. Defendant FedEx engaged in wrongful conduct by unreasonably engaging in these acts described above

86. By engaging in the wrongful conduct, Defendant FedEx intended to disrupt the relationship between Plaintiffs and Rodriguez Carrier and knew that the disruption of the relation was certain to occur. Further, Defendant's imposed time limitations upon which Plaintiffs could sell their valuable sales routes, which caused them to be sold at less than fair market value.

87. The Plaintiffs were harmed by the wrongful conduct because they were forced to sell their lines at substantially below fair market value.

88. The Defendant's conduct was a substantial factor in causing harm to Plaintiffs.

WHEREFORE, Plaintiffs pray for relief as hereinafter provided.

<u>**FOURTH CAUSE OF ACTION:**</u>
<u>**NEGLIGENT INTERFERENCE WITH A PROSPECTIVE**</u>
<u>**ECONOMIC ADVANTAGE**</u>

89. Plaintiffs re-allege and incorporate by reference the above Factual Allegations as if fully set forth herein.

SECOND AMENDED COMPLAINT FOR DAMAGES

ROY LEGAL GROUP
————§————
Attorneys at Law

90.  Plaintiffs and third-party, Rodriguez Carrier, Inc., were in an economic relationship that probably would have resulted in an economic benefit to Plaintiffs when they offered to purchase Plaintiffs' lines for $2,600,000 in August, 2016.

91. Defendant FedEx knew of the economic relationship because any sale of lines had to be approved by them, and the deal was presented to them for approval. Further, Defendant's imposed time limitations upon which Plaintiffs could sell their valuable sales routes, which caused them to be sold at less than fair market value.

92. The Defendant knew or should have known that this relationship would be disrupted if it failed to act with reasonable care.

93. Defendant FedEx engaged in wrongful conduct by unreasonably denying the sale of Plaintiffs' lines to Rodriguez Carrier.

94. This refusal to allow the sale did disrupt the relationship between Plaintiffs and Rodriguez Carrier.

95. The Plaintiffs were harmed by the wrongful conduct of Defendant.

96. The wrongful conduct was a substantial factor in causing harm to Plaintiffs.

WHEREFORE, Plaintiff s pray for relief as hereinafter provided.

### FIFTH CAUSE OF ACTION:
### NEGLIGENT HIRING, RETENTION AND SUPERVISON

ROY LEGAL GROUP
———*———
Attorneys at Law

97. Plaintiffs re-allege and incorporate by reference the above Factual Allegations as if fully set forth herein.

98. Defendant FedEx hired Martin Daza, who became the Senior Manager in charge of the Rialto terminal in March, 2015.

99. Martin Daza was unfit and incompetent to perform the work he was hired for because he "hated contractors," and committed acts against contractors intending to disrupt and terminate their businesses; further, he had been previously sued by other Defendant employees for tortious work related conduct at another location operated by Defendant.

100. Defendant FedEx knew, or should have known that Mr. Daza was unfit and incompetent in his employment and that this unfitness created a risk to others, because contractors expressed his harassing behavior toward them in the April, 2016, email from the contractors and by other oral and written complaints.

101. This unfitness and incompetence harmed Plaintiffs because they were, in retaliation and by pretext, unfairly terminated from their Linehaul agreements and the sale of their lines to Rodriguez Carrier were wrongfully denied.

102. Further, Mr. Daza employed a scheme to deprive Plaintiffs of their rights to file a wrongful termination of the Agreement by falsely claiming that Defendant had the right to breach the contract by not giving reasonable consent to

29

SECOND AMENDED COMPLAINT FOR DAMAGES

ROY LEGAL GROUP
———§———
Attorneys at Law

an assignment of Plaintiffs' valuable sales routes after the termination of the

contract.

103. The Defendant's negligence in hiring, supervising and retaining Martin

Daza was a substantial factor in causing Plaintiffs' harm.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1. For Compensatory damages;

2. For General Damages as to the Fourth and Fifth causes of  action;

3. Pre-judgment interest;

4. For attorney fees as allowed by law;

5. For Costs of suit;

6. For such other relief as the Court deems just.

JURY DEMANDED.


Dated: February 9, 2018                    **ROY LEGAL GROUP**



_____/s/_____

**FRANK P. AGELLO, ESQ. (204471)**
Attorney for Plaintiffs